UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRUMAINE THOMPSON,<br><br>Petitioner,<br><br>v.<br><br>W.L. MONTGOMERY, Warden,<br><br>Respondent. | Case No. ED CV 18-02161 SHK<br><br>MEMORANDUM OPINION AND ORDER DENYING PETITION, DISMISSING ACTION WITH PREJUDICE, AND DENYING CERTIFICATE OF APPEALABILITY |

## I.  INTRODUCTION

On October 3, 2018, Petitioner Trumaine Thompson ("Petitioner"), proceeding pro se, constructively filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his 2015 California state conviction for robbery, assault with a firearm, and unlawful possession of a firearm by a felon.  The Petition raises four claims.  The parties have consented to allow the magistrate judge to enter final orders and judgment in this case.  See U.S.C. § 636(c) and Fed.R.Civ.P. 73.  Because Petitioner has failed to demonstrate that the California state courts unreasonably denied any of these claims, the Court denies Petitioner's request for habeas relief on the merits, in its entirety, and dismisses the Petition with prejudice.

/ / /

## II.    PROCEDURAL HISTORY

In 2015, a jury in the Riverside County Superior Court convicted Petitioner of robbery in concert, being a felon in possession of a firearm, and two counts of assault with a firearm. Electronic Case Filing Number ("ECF No.") 17-2, 2 Clerk's Transcript ("CT") at 438-47.[1] After admitting he had served a prior prison term, the trial court sentenced Petitioner to 23 years and eight months in prison. Id. at 348, 462-63, 512-13.

Petitioner appealed to the California Court of Appeal, raising the claim corresponding to Ground One of the Petition herein. ECF No. 17-9, Lodg. No. 5. The state appellate court rejected the claim and affirmed the judgment in a reasoned decision. ECF No. 17-12, Lodg. No. 8. Petitioner then filed a Petition for Review in the California Supreme Court, which was denied summarily. ECF Nos. 17-13 and 17-14, Lodg. Nos. 9-10.

In November 2017, Petitioner filed a habeas corpus petition in the Riverside County Superior Court, raising the claims corresponding to Grounds Two through Four of the Petition herein. ECF No. 17-15, Lodg. No. 11. That petition was denied in a reasoned decision. ECF No. 17-16, Lodg. No. 12. Thereafter, he raised the same claims in habeas filings in the California Court of Appeal and California Supreme Court, both of which denied the claims summarily. ECF Nos. 17-17 through 17-20, Lodg. Nos. 13-16.

In October 2018, Petitioner, proceeding pro se, filed the instant Petition in this Court. ECF No. 1. In February 2019, Respondent filed an Answer and a supporting memorandum ("Answer"), arguing that the claims in the Petition

---

[1]   The referenced page number for the Clerk's Transcript (two volumes), Supplemental Clerk's Transcript (one volume), and the Reporter's Transcript (four volumes), and the state court filings and opinions lodged by Respondent will be the number assigned in those documents and not the page number associated with the document through the ECF system. With respect to the Petitioner's filings, namely the Petition and Traverse, the referenced page numbers will be those assigned by the Court's ECF system.

should be denied on the merits, and lodged the various related transcripts and state court filings and opinions. ECF Nos. 16-17. Thereafter, Petitioner filed a Traverse. ECF No. 24.

### III. PETITIONER'S CLAIMS

The Petition raises the following three grounds for relief:

1.     The police violated his constitutional rights by failing to collect exculpatory evidence on a motel surveillance video tape.

2.     Trial counsel provided ineffective assistance by failing to call witness S.H.

3.     Trial counsel provided ineffective assistance by failing to call all material witnesses.

4.     Trial counsel provided ineffective assistance by failing to properly cross-examine witnesses at trial.

ECF No. 1, Petition at 5-6.

### IV. FACTUAL SUMMARY

Because Petitioner has not rebutted the correctness of the findings of fact made by the California Court of Appeal regarding Petitioner's appeal in state court by clear and convincing evidence, the Court adopts the factual summary set forth in the California Court of Appeal's opinion affirming Petitioner's conviction. Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1). To the extent that an evaluation of Petitioner's individual claims depends on an examination of the trial record, the Court has made an independent evaluation of the record specific to those claims. The California Court of Appeal's Opinion is attached as Exhibit A to this R&R and the factual summary regarding the pre-plea proceedings at pages 4 through 9 is incorporated and adopted in this R&R. Exhibit A, California Court of Appeal's Opinion in The People v. Thompson, Case No. E062971 ("Cal. CoA Op.").

/ / /

3

# V. STANDARD OF REVIEW

The standards in the Anti-Terrorism and Effective Death Penalty Act of 1996 and 28 U.S.C. § 2254 govern this Court's review of Petitioner's grounds. Because the California Supreme Court summarily denied these claims on direct or collateral review, this Court reviews the reasoning in the California Court of Appeal's decision denying Ground One on appeal and the Riverside County Superior Court's decision denying Grounds Two through Four on habeas corpus. See ECF Nos. 17-12 and 17-16, Lodg. Nos. 8 and 12; Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018) ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").. Only if "fairminded jurists" would all agree that the state court's decision was wrong is Petitioner entitled to relief. See Harrington v. Richter, 562 U.S. 86, 102 (2011).

# VI. DISCUSSION

## A. Habeas Relief Is Not Warranted With Respect To Petitioner's Claim That His Constitutional Rights Were Violated By The Failure Of The Police To Obtain Exculpatory Evidence.

In Ground One, Petitioner claims that his constitutional rights were violated by law enforcement's failure to obtain a motel surveillance video tape from the night of the incident. ECF No. 1, Petition at 5. He argues that the video tape would have shown that he "never had a gun" and "never pushed in the motel room door by force," as claimed by witnesses at trial. ECF No. 24, Traverse at 25. He contends that the failure to collect the evidence was done in bad faith by the police. ECF No. 1, Petition at 5.

### 1. __Trial Court Proceedings__

Prior to the start of trial, Petitioner filed a Trombetta motion, asking the court to dismiss his case because the prosecution failed to preserve exculpatory evidence from the video surveillance at the motel in violation of his due process

4

rights.  See ECF No. 17-1, 1 CT at 186; ECF No. 17-2, 2 CT at 291; Cal. CoA Op. at 9-10.

At a pre-trial hearing, Officer Young testified that he was dispatched to the Hemet Motel to investigate an alleged robbery.  ECF No. 17-5, 2 Reporter's Transcript ("RT") at 199.  During his investigation, he watched video surveillance footage from a surveillance camera at the motel with the hotel manager.  Id. at 203-04, 219.  In the footage, he saw a black and silver Mercedes with chrome rims in front of room 3.  Id. at 205.  He then saw a woman leave room 3 of the motel and get into the back of the Mercedes.  Id. at 206-07.  That same woman and another female then got out of the car and walked back to room 3, followed shortly thereafter by two males that exited the car from the front seats of the Mercedes.  Id. at 207-09.  Officer Young later observed some individuals exit the room and leave in the Mercedes.  Id. at 210.  The quality of the video was not good enough to identify anyone or to read the license plate on the car.  Id. at 222.  Additionally, the video footage was a time lapse and would jump ahead several seconds in numerous places.  Id. at 222-23.  Officer Young asked for a copy of the video tape, but the office manager told him he would have to wait for her son because she did not know how to copy it.  Id. at 223.  Officer Young went to the motel two additional times over the next 10 days to get a copy but was unable to obtain the footage before it was erased.  Id. at 223-24.

Petitioner's counsel argued that the video surveillance footage was beneficial to the defense because it contradicted the victim's statement to police as the video did not show anyone running from the motel room or holding a gun.  Id. at 231-33.  Counsel argued that the police made no efforts to preserve the tape and, thus, acted in bad faith.  Id. at 233-34.  The prosecution countered that the video was of poor quality and did not contain exculpatory evidence.  Id. at 235-36.  Further, both Officer Young and the office manager could testify as to the content of the video.  Id. at 236.  Finally, the prosecution argued that the police did not act in bad faith, as

5

Officer Young tried to obtain a copy of the video tape on three separate occasions. Id. at 237.

In denying the Trombetta motion, the trial court noted that the law does not impose a duty on the prosecution to collect evidence simply because "that evidence might be favorable to the defense." Id. at 239. In any event, the court found the video tape did not contain exculpatory evidence because of the poor quality of the video. Id. at 240-42. Finally, the court ruled that the police did not act in bad faith, as Officer Young took appropriate measures to try to preserve the video tape. Id. at 243.

## 2. The California Court Of Appeal Opinion

On appeal, the California Court of Appeal rejected Petitioner's claim, finding that the video tape was not exculpatory and was not erased by any bad faith on the part of the police:

> Here, the Hemet Police Department was not in possession of the videotape. Officer Young viewed the video surveillance. The surveillance equipment was not owned by the police department. Officer Young had no control over the manager of the Hemet Motel, who eventually erased the video.
>
> Moreover, the destroyed evidence did not have exculpatory value that was apparent. The video did depict a black and silver Mercedes with chrome rims, which was similar to the one owned by [Petitioner]. The video surveillance also confirmed that two males and one female entered Room 3. This corroborated A.Z.'s and F.F.'s testimonies. The video surveillance did not include a depiction of what occurred inside the room. Moreover, the video had gaps and was grainy. The video had no apparent exculpatory value as it showed that [Petitioner] was present and did not show the events inside the room where each of the crimes occurred. The tape was as useful to the prosecution as it was to the defense.
>
> [Petitioner] also could obtain comparable evidence through the testimony of Hua and Officer Young. Both testified as to what was depicted in the video.
>
> Admittedly, the video surveillance could be "potentially useful" to [Petitioner]. As noted by [Petitioner], there were some contradictions between A.Z.'s testimony and what was depicted in the video. However, the video was

6

> not destroyed in bad faith [. . .]. Officer Young returned on two occasions to retrieve the video surveillance and was thwarted by Hua's lack of technical knowledge. Officer Young did not direct Hua to tape over the video. There simply was no bad faith on the part of Officer Young.

Cal. CoA Op. at 14-15 (internal footnoted omitted).

### 3. Applicable Federal Law And Analysis

The government's failure to collect and preserve potentially exculpatory evidence may violate due process. <u>California v. Trombetta</u>, 467 U.S. 479, 488-89 (1984); <u>Miller v. Vasquez</u>, 868 F.2d 1116, 1120 (9th Cir. 1989). The government's duty to preserve evidence, however, is "limited to evidence that might be expected to play a significant role in the suspect's defense" and that "possess[es] an exculpatory value that was apparent before the evidence was destroyed" and was of "such a nature that the defendant would be unable to obtain comparable evidence." <u>Trombetta</u>, 467 U.S. at 488-89. Further, the "failure to preserve potentially useful evidence does not constitute a denial of due process of law" unless the defendant "can show bad faith on the part of the police." <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988). Bad faith can be demonstrated by evidence of "official animus towards [a defendant] or of a conscious effort to suppress exculpatory evidence." <u>Trombetta</u>, 467 U.S. at 488.

Here, the state court rejected the claim because the lost evidence was not clearly exculpatory. The Court finds that decision was not objectively unreasonable. Petitioner has not demonstrated that the video tape held any immediately apparent exculpatory value. Officer Young testified that the video tape was of such poor quality that he could not identify any persons in the video—other than simply their gender—and could not obtain a license plate number from the Mercedes. Moreover, on its face, the evidence generally corroborated the victims' account to police that they had been assaulted and robbed in their motel room by three suspects driving a black and silver Mercedes. As such, there was no

Trombetta violation.  See, e.g., United States v. Drake, 543 F.3d 1080, 1090 (9th

Cir. 2008) (finding no violation of Trombetta because the lost video evidence "was

far from clearly exculpatory; indeed, it is possible that it would have further

incriminated [the defendant]"); Keller v. McDonald, 2011 WL 5417010, at *6 (N.D.

Cal. Nov. 8, 2011) (finding that, although the destroyed video "show[ed]

provocative conduct by the victim," it was not "clearly exculpatory" under

Trombetta because "the tape also was highly inculpatory") (internal quotations

omitted).

Nevertheless, Petitioner claims that the evidence would have been useful at

trial because it contradicted the victims' testimony that Petitioner "pushed in the

motel room door by force" and "ran from the room with a gun." ECF No. 24,

Traverse at 25.  In light of the poor quality of the video and the time lapse nature of

the recording, it is not clear that the evidence would have demonstrated either of

those contentions.  Even assuming the destroyed video tape evidence was

"potentially useful" to the defense, there was no due process violation in this

instance because the police did not act in bad faith in failing to preserve the it.

Youngblood, 488 U.S. at 58; Miller, 868 F.2d at 1120 (finding the "failure to

preserve evidence that is only *potentially* useful does not violate due process in the

absence of bad faith on the part of the police" (italics in original)).

Instead, the evidence is uncontradicted that Officer Young made repeated

trips to the motel in an effort to collect the video tape for evidence but was

prevented from doing so by the officer manager's inability to make a copy without

the assistance of her son before it was erased.  This undermines any argument that

there was a "conscious effort to suppress exculpatory evidence" by the police.

Trombetta, 467 U.S. at 488; see also Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir.

1997) (holding that government's "negligence" in failing to preserve potentially

useful evidence was not sufficient to establish bad faith); Keller, 2011 WL 5417010,

at *8 ("Perhaps the police were negligent in relying on the store owner's assurances

that the tape would be preserved for 90 days, but this is not sufficient to show bad faith and establish a violation of due process in this case.").

For these reasons, the state court's rejection of Petitioner's claim in Ground One was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this claim.

## B. Habeas Relief Is Not Warranted With Respect To Petitioner's Claims Of Ineffective Assistance Of Counsel.

In Grounds Two through Four, Petitioner contends that his trial counsel was ineffective under constitutional norms. ECF No. 1, Petition at 5-6. First, he argues that counsel should have called S.H. as a witness at the pre-trial <u>Trombetta</u> hearing to testify regarding Officer Young's "bad faith." ECF No. 24, Traverse at 32-40. Next, he claims that counsel should have called all the police officers who responded to the scene at the Hemet Motel to demonstrate Officer Young's bad faith in failing to collect the surveillance video tape. <u>Id.</u> at 31-45. Finally, he alleges that counsel failed to adequately cross-examine the witnesses at trial. <u>Id.</u> at 46-54.

### 1. The Riverside County Superior Court Opinion

The Riverside County Superior Court denied Petitioner's ineffective assistance claims on collateral review, finding that his claims lacked specificity and, thus, failed to establish a prima facie case of relief. ECF No. 27-16, Lodg. No. 12 at 1. The superior court specifically noted that Petitioner failed to demonstrate that his trial counsel was ineffective or that, even if he were, that "it would have led to a different result at trial." <u>Id.</u> at 2.

### 2. Federal Law And Analysis

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In order to prevail on a claim of ineffective assistance of counsel, Petitioner must establish two things: (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) the deficient

performance prejudiced the defense, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687-88, 694. A claim of ineffective assistance must be rejected upon finding either that counsel's performance was reasonable or that the alleged error was not prejudicial. Id. at 697; see also Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the Strickland test obviates the need to consider the other."). Where, as here, the ineffective assistance of counsel claims have previously been adjudicated in state court, the Court's review is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009); see also Richter, 562 U.S. at 105 ("The standards created by Strickland and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so." (quoting Knowles, 556 U.S. at 123)).

Petitioner's claims that trial counsel was ineffective for failing to call additional witnesses at the Trombetta hearing are speculative. At trial, S.H. testified for the prosecution that Petitioner told him that he and another person had robbed a girl of heroin at a motel. ECF No. 17-6, 3 RT at 503-04. S.H. also testified that Petitioner called him from jail several times and asked him to "lie for him" at trial or not come to court at all. Id. at 510-12. Nevertheless, Petitioner argues, without any supporting evidence, that if counsel had called S.H. as a witness at the Trombetta hearing he would have testified about the "crookedness of the D.A. and police," resulting in a finding that the police acted in bad faith when they failed to collect the video tape evidence. ECF No. 24, Traverse at 39. "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). see also Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (holding vague speculation or mere conclusions without reference to the record or other documentary evidence fails to discharge a petitioner's prima facie burden for an ineffective assistance of counsel claim).

Petitioner's related claim that counsel should have called all the police officers who responded to the scene at the Hemet Motel to demonstrate Officer Young's bad faith in failing to obtain the surveillance video tape is equally unavailing. Petitioner offers no evidence as what any of the other officers would have testified had they been called as witnesses and, more importantly, offers no reasonable argument how their testimony would have had any effect on the outcome of the Trombetta hearing. Absent such proof, Petitioner is not entitled to relief. See Bragg v. Galaza, 242 F.3d 1082, 1088-89 (9th Cir. 2001) (finding mere speculation that witness might have given helpful information if interviewed not enough to establish ineffective assistance); Dows v. Wood, 211 F.3d 480, 486-87 (9th Cir. 2000) (denying ineffective assistance claim for failing to call witnesses when petitioner failed to submit declarations setting out what witness would have said).

Finally, there is no merit to Petitioner's claim that counsel failed to adequately cross-examine witnesses S.H. and F.F. at trial, both of whom inculpated Petitioner in the crimes. Defense counsel attempted to undermine S.H.'s credibility. On cross-examination, defense counsel pointed out S.H.'s numerous felony convictions, including selling narcotics and illegally possessing guns. ECF No. 17-6, 3 RT at 512-13. Counsel also got S.H. to admit that he had a "cocaine problem," that he had been arrested for the crimes at the Hemet Motel, and talked to the prosecutor because he was "concerned" with getting himself out of jail. Id. at 513-19.

As for F.F., who participated in the robbery and was testifying under a grant of immunity, defense counsel pointed out her history of dishonesty and incentive to incriminate Petitioner and minimize her own culpability. On cross-examination, F.F. admitted that she had been convicted of identity theft, forgery, and prostitution, and had given police a false identity. Id. at 447-49. She also admitted that she talked with the police about the motel robbery because she had hoped to cut

11

a deal and get out of jail. Id. at 464. F.F. testified that she had been released from custody as part of the agreement to testify against Petitioner and hoped to receive probation rather than going back to jail. Id. at 473, 494.

Undermining a witness's credibility and showing reasons for potential bias is an effective cross-examination strategy. As such, Petitioner has failed to demonstrate counsel's cross-examination of the witnesses was objectively unreasonable under prevailing professional norms. See Strickland, 466 U.S. at 687-88. Nevertheless, Petitioner argues that counsel should have questioned the witnesses about "exculpatory statements" the witnesses made out of court and prior to trial. Petitioner does not, however, identify the specific statements or provide any evidence that further cross-examination would have undermined the incriminating testimony of either witness at trial. Thus, Petitioner has not demonstrated prejudice from any failure to cross-examine the witnesses. See Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (rejecting ineffective assistance of counsel claim for lack of prejudice where counsel failed to conduct cross-examination on a specific issue), overruling on other grounds recognized by Apelt v. Ryan, 878 F.3d 800, 827 (9th Cir. 2017).

Accordingly, the state court's denial of Petitioner's ineffective assistance of counsel claims was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, habeas relief is foreclosed as to Grounds Two, Three, and Four.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# VII.    CONCLUSION

For these reasons, the petition is denied and the action is dismissed with prejudice.  Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, he is not entitled to a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336 (2003); see also Fed.R.App.P. 22(b).

DATED:  January 24, 2020

HON. SHASHI H. KEWALRAMANI
United States Magistrate Judge

# EXHIBIT A

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TRUMAINE THOMPSON,<br><br>        Defendant and Appellant. | E062971<br><br>(Super.Ct.Nos. SWF1401805 & SWF1101841)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Irma Poole Asberry, Judge. Affirmed with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette C. Cavalier and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

In June 2014 defendant and appellant Trumaine Thompson, a convicted felon, set up a drug deal with A.Z. at the Hemet Motel.  Defendant was to purchase heroin valued at over $2,000 from A.Z.; he brought his girlfriend and a friend with him to help.  Instead of paying A.Z. the money, he held her at gunpoint while the friend held her boyfriend N.A. at gunpoint, beat her with the gun, and stole the heroin from her.  Defendant was convicted of robbery in concert, possession of a firearm by a felon and two counts of assault with a firearm.

Defendant claims on appeal as follows:  (1) The trial court erred and deprived him of his due process rights and a fair trial pursuant to the Sixth and Fourteenth Amendments by denying his *Trombetta*[1] motion due to the destruction of video surveillance tape; (2) the trial court violated his Sixth and Fourteenth Amendment rights to due process and a fair trial by admitting irrelevant gang evidence; (3) his convictions of assault with a firearm against N.A. must be reversed for lack of substantial evidence; (4) the trial court erred by refusing his special instruction on the charges of assault with a firearm; (5) the firearm allegations must be stayed or stricken for some counts; and (6) his sentence for being a felon in possession of a firearm should be stayed.

We agree that defendant's sentence on the firearm-use enhancements must be modified, but otherwise affirm the judgment.

---

[1]  *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*).

# FACTUAL AND PROCEDURAL HISTORY

A.    <u>PROCEDURAL HISTORY</u>

Defendant was convicted in count 1 of robbery in concert (Pen. Code, §§ 211, 213, subd. (a)(1)(A));[2] in count 2 with possession of a firearm by a felon (§ 29800, subd. (a)(1)); in count 3 with assault with a firearm upon A.Z. (§ 245, subd. (a)(2)); and in count 4 with assault with a firearm upon N.A. (§ 245, subd. (a)(2)).  In addition, the jury found true the special allegations for count 1 that defendant both personally used, and a principal was armed with, a handgun (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)).  For counts 3 and 4, the jury found true the special allegations that defendant personally used a firearm and participated in the crimes knowing a principal was armed with a firearm (§§ 12022, subd. (a)(1), 12022.5, subd. (a)).  Defendant admitted that he had suffered a prior prison term (§ 667.5, subd. (b)).

Defendant was sentenced to nine years for the robbery, plus 10 years for personal use of a firearm pursuant to section 12022.53, subdivision (b), one additional year for the principal armed enhancement, and one year for the prior prison term.  He was additionally sentenced to eight months on count 2.  The substantive charge and enhancements on count 3 were stayed.  On count 4, defendant was sentenced to one year for the substantive charge, plus one year for the principal armed enhancement.  He received a total sentence of 23 years eight months to be served in state prison.

---

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

B.    <u>FACTUAL HISTORY</u>

1.    *PEOPLE'S CASE-IN-CHIEF*

As of June 28, 2014, F.F.[3] had been dating defendant for over one year; they lived together.  While they were dating, they did a lot of drugs, primarily methamphetamine.  F.F. earned money as a prostitute.  Defendant sold drugs on a daily basis while they were together, mostly methamphetamine and heroin.  F.F. had seen defendant with a revolver.  Defendant owned a black and silver Mercedes.

On June 28 F.F. went with defendant to the Hemet Motel.  She understood from defendant they were going there for a drug deal.  Someone she knew as "Face" went with them; it was not S.H.  F.F. smoked methamphetamine right before they left.[4]  When they arrived at the motel, A.Z. came outside and got into the backseat.

Defendant told A.Z. that he wanted to weigh the drugs prior to buying them.  A.Z. did not want defendant to go into her room so F.F. went inside with her.  Defendant handed F.F. a bag containing money prior to her going into the motel room.  F.F. and A.Z. went into the bathroom where A.Z. had the scale.  F.F. pulled the money out of the bag but she only counted $230; she understood the deal was for defendant to pay A.Z. $2,000.  F.F. knew that she did not have enough to buy the large amount of heroin.  At that point, defendant entered the motel room holding a gun.  Face held a gun to N.A., who was face down on the bed.

---

[3]  F.F. was given a deal and instead of jail time, she was sent to drug rehabilitation.

[4]  F.F. had been sober since her arrest.

Defendant tried to grab the heroin but A.Z. would not give it up. He struggled with A.Z. F.F. denied that she hit A.Z. Defendant was able to grab the drugs out of A.Z.'s hand. Defendant, F.F. and Face all went to the car; defendant told them not to run. They got in the car. A.Z. approached the window and said she would give them one more chance to give her back the drugs and she would not call the police.

A.Z.[5] recounted a similar story. She admitted she had been a heroin addict for six years; at the time of trial, she had been sober for only four months. When she was using, she used every day at a cost of $40 to $50 each day. She sometimes sold heroin to support her habit. A.Z. knew defendant as Red.

Around 1:00 p.m. on June 28, A.Z. and her boyfriend N.A. were staying in room 3 at the Hemet Motel. A.Z. had set up a deal with defendant to buy heroin from her. A.Z. had purchased heroin and methamphetamine from defendant before and always paid cash; she did not owe him any money.

A.Z. was going to sell 3 ounces of heroin to defendant. It was worth $2,100. Defendant arrived in a silver or black car. Defendant had a woman A.Z. knew as Kat (who was F.F.) and another male was in the backseat who she did not recognize. He had a tattoo on his face.

A.Z. went out to defendant's car. A.Z. got in the backseat of the car. Defendant told her he did not feel safe making the transaction in the motel parking lot and wanted to

---

[5] A.Z. was granted immunity for her testimony.

drive her somewhere else. He wanted to weigh the heroin. A.Z. said she would only be comfortable if she and F.F. went into the motel room and weighed the heroin.

A.Z. and F.F. went into room 3. They went into the bathroom where A.Z. kept a scale. Before A.Z. had a chance to weigh it, she noticed that F.F. only had $60. They heard something coming from the front of the room and F.F. tried to grab the drugs from her. At that point, defendant and the other male ran into the room. They had guns drawn. Defendant came into the bathroom. Defendant put a gun to A.Z.'s head. Defendant told A.Z. to give him the heroin. A.Z. did not give him the heroin. He hit her in the head with the gun. She was hit with the gun at least two more times and defendant also hit her with his fists. F.F. also hit her with a vase. When A.Z. could not take any more she dropped the heroin on the floor. Defendant picked it up. She was bleeding and had bruising after the incident.

Defendant and the others also took cell phones belonging to A.Z. and N.A. A.Z. ran after them. A.Z. went after them because she thought maybe she could get help outside. When she went outside, she saw that the manager at the hotel was outside in her car watching them. A.Z. pleaded with defendant to give back the drugs or give her money but he drove away.

A.Z. initially lied to the police and the motel manager; she told them that defendant and the others had stolen cash. She thought she would get in trouble for selling heroin. A.Z. later admitted on her own that defendant took heroin from her. A.Z. admitted she had some relapses and took heroin in the prior four months.

Hemet Police Officer Derrick Young was dispatched to a call that a robbery had taken place at the Hemet Motel. He spoke with A.Z. She had several cuts to her face and was bleeding. The side of her face was swollen and was already starting to develop a bruise. She was visibly shaken. A.Z. told him that three suspects came into their motel room and robbed her and N.A. at gunpoint.

Officer Young viewed video surveillance at the motel. There were three to five second gaps in the video due to time lapse, which made the video jump forward. He observed on the video a black and silver Mercedes parked outside of room 3. He could not read the license plate because the video was not clear enough and was too far away. A female came out of the room and went out to the car. He saw two females exit the car and go into room 3. He saw one male exit the driver's side of the car and another male exit the backseat. They went to the door to room 3 and then the video jumped ahead. He observed two African-American males and one female exit room 3 and get in the Mercedes. There was a fast forward in the video and then he saw the car drive away. He could not identify defendant in the video.

Officer Young attempted to obtain a copy of the video from the motel manager. He was unable to get a copy because the manager did not know how to copy the video and indicated she had to wait for her son to copy it. He did not use his personal cellular telephone to video the video surveillance as he did not want his phone to become discoverable. He went back twice and tried to get the video surveillance but was unable to obtain it.

Officer Young arrested defendant on July 3; defendant was in a black and silver Mercedes. Officer Young had A.Z. look at a six-pack photographic lineup; she identified defendant. She also identified S.H. as the other male and F.F. as the female present during the robbery.

After they were arrested, defendant talked to F.F. about making up a new story. He wrote her a letter advising her, "Keep this shit gangsta and we go home." F.F. said it was reference to a gangster code to keep quiet and not be a snitch. He also wrote, "Fuck Jessica on the almighty 212." F.F. indicated that 212 was defendant's gang. "Almighty 212" meant that F.F. was to keep her mouth shut or she would be hurt or killed. When F.F. decided to tell the truth, he told her to say that it was she that fought with A.Z. because F.F. would get less prison time than defendant would. Defendant sent her letters outlining what she was supposed to say to the police. F.F. had prior convictions of identity theft and forgery. She lied about her name to police when she was arrested.

S.H. was staying with defendant and F.F. on June 28. Defendant told S.H. that he had stolen heroin from a woman and man at a motel. Defendant gave S.H. some of the heroin. S.H. was arrested with defendant and spent over three months in jail until he was finally released and not charged. Defendant called S.H. and asked him to testify for him and say that everyone was lying. He also told him not to testify and to just go on vacation.

The parties stipulated that defendant was a person prohibited from possessing a firearm due to a prior felony conviction.

### 2. *DEFENSE*

Jacob Herchert was a paramedic who responded to treat A.Z. A.Z. complained only of suffering a bloody nose and she refused to be transported.

Yu Ping Hua worked as the manager of the Hemet Motel. As of June 28, 2014, A.Z. and N.A. had been staying at the motel for several months. On that day, she observed A.Z. standing near a black car. The car started to leave and A.Z. chased after it. Hua told A.Z. to call the police when she saw A.Z.'s face was covered in blood. Hua was worried so she called 911. Hua looked at the video surveillance after the incident. The quality was not clear so she could not see who ran from the room to the car.

## DISCUSSION

### A. *TROMBETTA* MOTION

Defendant insists the Hemet police had an obligation to preserve the video surveillance from the motel as it was clearly exculpatory. Officer Young acted in bad faith by failing to preserve the tape. Defendant contends the case should have been dismissed, the jury should have been instructed they should presume the video would have disputed and contradicted the testimony of A.Z. and F.F., or the jury should have been instructed with CALCRIM No. 306 that the prosecution must disclose and preserve evidence.

### 1. *ADDITIONAL FACTUAL BACKGROUND*

On December 23, 2014, defendant brought a motion for sanctions, e.g. a *Trombetta* motion. According to the motion, Officer Young viewed 10 minutes of video surveillance at the motel, as detailed during his and Hua's testimony, *ante*. Defendant

contended the video contained exculpatory information.  Officer Young made no effort to collect and preserve the video.  The video had been taped over.  The failure to preserve this exculpatory evidence violated defendant's due process rights and was done in bad faith.  Defendant contended dismissal was the only appropriate sanction.

After a jury was impaneled, the trial court heard the *Trombetta* motion.  Initially, the trial court excluded a 911 call and testimony of the 911 dispatcher, including a statement that Hua told the dispatcher that there was a surveillance camera and the license plate of the car involved would be on the camera, as hearsay.  In addition, the trial court excluded testimony by two police dispatchers regarding requests to run license plates.

Officer Young testified in opposition to the *Trombetta* motion.  Like he testified at trial, he watched the videotape at the motel.  He observed a black Mercedes in front of room 3.  He observed A.Z. exit room 3 and go to the Mercedes; A.Z. get out of the car and walk in the room with a female; and two males enter room 3 after them.  He observed some individuals exit the room and leave in the Mercedes.  The quality of the video was not good enough to identify anyone or to read the license plate on the car.  Additionally, the video footage was a time lapse and would jump ahead several seconds in numerous places.  He tried to obtain a copy but Hua said she did not know how to copy it.  Officer Young tried two additional times to obtain the footage but could not get it.

Defendant's counsel argued that the events that were shown in the video surveillance footage depicted events that were different than described by A.Z.  Officer Young was able to see enough detail that the car was black and had chrome rims.  He

could distinguish between males and females. The video did not depict anyone running from the motel room or holding a gun, which contradicted A.Z.'s statement. Further, Hua described events she observed in the video that were not testified to by Officer Young. There were no efforts made to preserve the tape and it was beneficial to the defense. The officers could have taken pictures with their cameras of the video footage. The destruction of the video was in bad faith because Officer Young was aware that the footage contradicted A.Z.'s statement. The appropriate sanction was dismissal. The video was the only solid evidence because all of the People's witnesses had credibility problems.

The People stated that the video was not a consistent feed and had gaps. It was bad quality. Hua had no obligation to maintain the video. The video did not contain exculpatory evidence. There was comparable evidence in that Officer Young and Hua would testify as to the content of the video. Further, Officer Young was not in possession of the video; he had no control over the video being destroyed. Officer Young did not act in bad faith. He viewed the video and tried to obtain it on three occasions.

Defendant's counsel responded that police officers have a duty to collect and preserve evidence that is exculpatory. It would have been easy for Officer Young to preserve the evidence.

The trial court first noted that the cases cited by defendant make clear that the law does not impose a duty on the prosecution to collect evidence if that evidence might be favorable to the defense. However, once collected, it must be preserved. Here, it was evident the video surveillance footage was not in the custody of the Hemet Police

Department.  It was recorded over by Hua and that was not done or facilitated by Officer Young.  He took appropriate measures to try to preserve it.  Also, based on the evidence presented, the video did not contain exculpatory evidence.  Officer Young testified the video had bad quality.  The individuals could not be identified and the license plate numbers were not visible.

Further, it was not entirely clear that the video would contradict A.Z.'s testimony.  The video was on time lapse so it may not have depicted everything that occurred.  The fact that the video showed that they were not running to the car or that no firearms were seen outside the motel room was not exculpatory as to what occurred inside the motel room.  There was going to be testimony as to the contents of the video by two witnesses.  There was testimony from the motel manager.  The trial court found that there was no evidence that the video was in fact exculpatory.  There was no bad faith shown.  The motion was denied.

2.    *LEGAL PRINCIPLES*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  (*Brady v. Maryland* (1963) 373 U.S. 83, 87.)  "*Trombetta* outlines how the state's failure to preserve evidence may violate those rights.  In *Trombetta*, the high court limited the state's affirmative duty to preserve evidence to that which 'might be expected to play a significant role in the suspect's defense.'  [Citation.]  This standard of 'constitutional materiality' imposes two requirements that a defendant must meet in order to show a due

process violation.  As an initial matter, the evidence must 'possess an exculpatory value that was apparent before [it] was destroyed.' [Citation.]  Additionally, it must 'be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" (*People v. Lucas* (2014) 60 Cal.4th 153, 221, disapproved on other grounds in *People v. Romero* (2015) 62 Cal.4th 1.)

In *Arizona v. Youngblood* (1988) 488 U.S. 51, the court found that "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful* evidence does not constitute a denial of due process of law." (*Id.* at p. 58, italics added.)

"The California Supreme Court has summarized the requirement to retain evidence and when the failure to do so violates due process as follows.  The prosecution's 'failure to retain evidence violates due process only when that evidence "might be expected to play a significant role in the suspect's defense," and has "exculpatory value [that is] apparent before [it is] destroyed." [Citation.]  In that regard, the mere "possibility" that information in the prosecution's possession may ultimately prove exculpatory "is not enough to satisfy the standard of constitutional materiality." [Citation.]  And whereas under *Brady*, . . . the good or bad faith of the prosecution is irrelevant when it fails to *disclose* to the defendant material exculpatory evidence [citation], a different standard applies when the prosecution fails to *retain* evidence that is potentially useful to the defense.  In the latter situation, there is no due process violation unless the accused can show bad faith by the government.'" (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773)

A trial court's ruling on a *Trombetta* motion is upheld on appeal if a reviewing court finds substantial evidence supporting the ruling. (*People v. Memro* (1995) 11 Cal.4th 786, 831, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172.)

3. *ANALYSIS*

"Generally, due process does not require the police to collect particular items of evidence." (*People v. Montes* (2014) 58 Cal.4th 809, 837.) "'The police cannot be expected to "gather up everything which might eventually prove useful to the defense.""" (*Ibid.*)

In *People v. Montes*, *supra*, 58 Cal.4th 809, the defendant filed a *Trombetta* motion to dismiss the case complaining the police failed to collect a blood sample from the defendant at the time of his arrest. The defendant stated that the blood test would have shown high levels of methamphetamine in his system to support his intoxication defense. (*Id.* at pp. 836-837.) The court found that *Trombetta/Youngblood* did not apply. It stated, "This is not a case where evidence initially gathered was destroyed. The issue here is the asserted failure of the police to collect relevant exculpatory evidence. Although we have suggested that cases may arise in which the failure to collect evidence could justify sanctions against the prosecution at trial, the failure to collect a blood sample from defendant at the time of his arrest but almost 24 hours after the crime is not such a case." (*Montes*, at pp. 837-838.)

Here, the Hemet Police Department was not in possession of the videotape. Officer Young viewed the video surveillance. The surveillance equipment was not owned by the police department. (See *People v. Alvarez*, *supra*, 229 Cal.App.4th at p.

767, 776-777 [failure to preserve video surveillance on cameras owned and operated by the police department].)  Officer Young had no control over the manager of the Hemet Motel, who eventually erased the video.

Moreover, the destroyed evidence did not have exculpatory value that was apparent.  The video did depict a black and silver Mercedes with chrome rims, which was similar to the one owned by defendant.  The video surveillance also confirmed that two males and one female entered Room 3.  This corroborated A.Z.'s and F.F.'s testimonies.  The video surveillance did not include a depiction of what occurred inside the room.  Moreover, the video had gaps and was grainy.  The video had no apparent exculpatory value as it showed that defendant was present and did not show the events inside the room where each of the crimes occurred.  The tape was as useful to the prosecution as it was to the defense.

Defendant also could obtain comparable evidence through the testimony of Hua and Officer Young.  (*People v. Lucas*, *supra*, 60 Cal.4th at p. 221.)  Both testified as to what was depicted in the video.

Admittedly, the video surveillance could be "potentially useful" to defendant.  As noted by defendant, there were some contradictions between A.Z.'s testimony and what was depicted in the video.  However, the video was not destroyed in bad faith as required by *Youngblood*.  Officer Young returned on two occasions to retrieve the video surveillance and was thwarted by Hua's lack of technical knowledge.  Officer Young did not direct Hua to tape over the video.  There simply was no bad faith on the part of Officer Young.

Defendant was not entitled to dismissal or an instruction regarding the missing video. When the defendant has failed to show a *Trombetta/Youngblood* violation, "[t]he trial court [is] not required to impose *any* sanction, including jury instructions. [Citations.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 811.) The trial court's determination that there was no violation of *Trombetta/Youngblood* is supported by substantial evidence.

B.    ADMISSION OF GANG EVIDENCE

Defendant contends the trial court violated his Sixth and Fourteenth Amendment rights to due process and a fair trial by admitting irrelevant gang evidence. Specifically, admission of F.F.'s testimony, which referred to letters written to her by defendant telling her to keep it "gangsta" and mentioning 212, which she indicated was his prison gang, requires reversal.

1.    *ADDITIONAL FACTUAL BACKGROUND*

Prior to trial, defendant sought to exclude any references to gang evidence. The prosecutor explained that he did not intend to bring in a gang officer to state that defendant was a gang member. The prosecutor noted that defendant made reference to "212", his prison gang membership. S.H. was also a member of 212 and in letters defendant sent to F.F. he stated "The almighty 212." It was relevant because defendant had called S.H. and S.H.'s wife telling them they should not testify.

Defendant's counsel contended that the gang evidence was not relevant to any issue in the case. Moreover, it was highly prejudicial. It had nothing to do with whether

the charges were true.  There was no gang allegation.  It should be excluded as too prejudicial under Evidence Code section 352.

The trial court ruled, "I will permit this evidence.  I do find it to be relevant and material in this matter.  It does show some consciousness of guilt on the part of [defendant] if statements were made, reference to witnesses, alleged coconspirators to— for them to keep things gangster, or to put it 212, telling them to keep this information quiet.  [¶]  We do have a situation here, quite obviously, where the trier of fact will be making determinations about whether, in fact, the alleged incidents did, in fact, occur.  This would serve as be circumstantial evidence.  I do not find in the tenure of just presenting the statements, . . . I don't find that that is substantially prejudicial to the defense.  It's not a claim that he's a gang member, or anything associated with that.  In fact, the People have said they don't intend to present a gang expert.  The testimony doesn't seem like it would involve that much time if we're talking about some letters and perhaps some jail calls.  It would be straightforward and does not appear that there would be any confusion to our jurors."

2.    *ANALYSIS*

"The trial court has great discretion in determining the admissibility of evidence, and on appeal, we find reversible error if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice." (*People v. Williams* (2009) 170 Cal.App.4th 587, 606.)

"In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is

minimal. [Citations.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

"Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

Here, the trial court found the fact that defendant told his girlfriend to keep it "gangsta" and mentioned 212, a prison gang, was relevant to show consciousness of guilt and to show that defendant told the witnesses to be quiet. The fact that defendant tried to intimidate F.F. and S.H. through use of his gang affiliation to not testify was relevant to show his consciousness of guilt. Additionally, the evidence was not overly prejudicial. It only a consumed a small portion of the trial. At no time did the prosecutor argue that such evidence was relevant to show defendant's disposition to commit the crime. The trial court did not err by admitting the gang evidence.

Even if the trial court erred by admitting the evidence, such admission was harmless. "The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded." (*People v. Avitia*, *supra*, 127 Cal.App.4th at p. 194) "'Only if

there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.'" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

Here, F.F. and A.Z. testified that defendant went to the motel room and robbed A.Z. of the heroin. Although there were some discrepancies in their testimonies, they consistently testified that defendant hit A.Z. with a gun and took the heroin without paying for it. Additionally, after the crime, defendant told S.H. that he had stolen heroin from a woman at a motel and gave S.H. some heroin. The gang evidence was only briefly mentioned and not used to show defendant had a disposition to commit the crime. The admission of the gang evidence was not prejudicial.

### C.    INSUFFICIENT EVIDENCE OF ASSAULT WITH A FIREARM

Defendant contends his conviction in count 4, assault with a firearm on N.A., must be reversed. He insists there was no evidence admitted supporting that either the firearm held by Face was loaded, or that defendant used a firearm as a bludgeon. As such, the trial court erred by failing to grant his section 1118.1 motion requesting dismissal of count 4.

At the end of the People's case-in-chief, defendant brought a section 1181.1 motion to dismiss count 4. He argued that there had to be evidence either that the firearm was loaded or used as a bludgeon to support the assault with a firearm charge. The People responded that since the gun was pointed at N.A., the jury could reasonably

determine that it was loaded.  The trial court denied the motion to dismiss.  First, as to

A.Z., it was clear the gun was used as a bludgeon.  Moreover, as to count 4, the charge

for N.A., the trial court found there was sufficient evidence of the elements of the crime

from which the jury could reasonably find defendant guilty.

"In reviewing a claim for sufficiency of the evidence, we must determine whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime or special circumstance

beyond a reasonable doubt.  We review the entire record in the light most favorable to the

judgment below to determine whether it discloses sufficient evidence—that is, evidence

that is reasonable, credible, and of solid value—supporting the decision, and not whether

the evidence proves guilt beyond a reasonable doubt."  (*People v. Jennings* (2010) 50

Cal.4th 616, 639.)

"In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial

court applies the same standard an appellate court applies in reviewing the sufficiency of

the evidence to support a conviction, that is, '"whether from the evidence, including all

reasonable inferences to be drawn therefrom, there is any substantial evidence of the

existence of each element of the offense charged."  [Citations.]'  'Where the section

1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of

the evidence is tested as it stood at that point.'"  (*People v. Cole* (2004) 33 Cal.4th 1158,

1212-1213.)

"We review independently a trial court's ruling under section 1118.1 that the

evidence is sufficient to support a conviction.  [Citation.]  We also determine

independently whether the evidence is sufficient under the federal and state constitutional due process clauses." (*People v. Cole*, *supra*, 33 Cal.4th at p. 1213.)

Under section 240, an assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Section 245, subdivision (a)(2) provides that when the assault is committed by a firearm, it is a felony. "[I]t has been stated that if a person points an unloaded gun at another, without any intent or threat to use it as a club or bludgeon, he does not commit a simple assault under Penal Code section 240, because 'there is in such a case no present ability to commit a violent injury on the person threatened *in the manner in which the injury is attempted to* be committed.'" (*People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544.)

"California courts have often held that a defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 12.) "'The acts and language used by an accused person while carrying a gun may constitute an admission by conduct that the gun is loaded.'" (*Id.* at p. 13.)

Here, F.F. indicated that the drug deal with A.Z. was set up in advance. Defendant clearly planned to rob A.Z. as he did not bring enough money to purchase the heroin. Moreover, if defendant intended to pay for the heroin, there would have been no need to bring Face with him. Defendant had the intent to rob A.Z. prior to going to the hotel. He brought along Face to subdue N.A. Face held the gun to N.A. Such circumstantial evidence supports that Face's gun was loaded. The trier of fact could reasonably

conclude that defendant and Face would bring loaded weapons to a drug deal involving over $2,000 worth of heroin.

Defendant relies on *People v. Bekele* (1995) 33 Cal.App.4th 1457, to support his claim that the actions of Face holding the gun to N.A. was not enough to support his conviction. In *Bekele,* the appellate court concluded that there was not sufficient evidence to support the defendant's conviction of assault with a firearm when he pulled a gun from his pocket and pointed it at a man chasing him saying "Don't." (*Id.* at p. 1460.) However, The California Supreme Court disapproved of *Bekele* because the appellate court engaged in improper fact finding. It found, "Like the decision under review, the published portion of *Bekele* did not refer to the standard of review for claims of insufficiency of evidence or explain how the normal presumption favoring the judgment was overcome. . . . It simply reviewed the evidence considered by the jury and drew therefrom different inferences." (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 13-14.)

Here, the jury could reasonably infer that Face's gun was loaded. The circumstantial evidence supports that the gun used by Face was loaded, to support defendant's conviction in count 4.

D.    <u>INSTRUCTIONAL ERROR ON ASSAULT WITH A FIREARM</u>

Defendant contends his convictions in counts 3 and 4, assault with a firearm, must be reversed because the pattern jury instruction, CALCRIM No. 875, did not adequately inform the jury that the firearm had to be loaded or used as a bludgeon. Such failure to instruct on this element of the crime deprived him of his right to have the jury consider

all of the elements of the crime, and the error cannot be considered harmless beyond a reasonable doubt.

Defendant requested a special instruction be given along with CALCRIM No. 875 based on the case of *People v. Rodriguez*, *supra*, 20 Cal.4th 1. Defendant requested the jury be instructed that "in order for the defendant to have the present ability to apply force with a firearm that there must be evidence that . . . the gun has to have been loaded or the gun was used as a club or bludgeon." The People objected to the special instruction as it would confuse the jury; the jury instruction was proper as read. The trial court stated that in the "[U]se [N]otes" for CALCRIM No. 875, it provides that in order for the defendant to have the present ability to injure, the gun must be loaded unless it is used as a club or bludgeon. However, the Use Notes also include that CALCRIM No. 875 had been approved as written in *People v. Golde* (2008) 163 Cal.App.4th 101. The trial court found, "I do not find that I have any legal authority that tells me I must give a further instruction to point out that the firearm either had to be loaded or to be used as a club or bludgeon."

Whether a jury instruction is correct and adequate is a question of law, which we review de novo. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 358.)

As previously stated, section 245, subdivision (a)(2) prohibits "an assault upon the person of another with a firearm." Section 240 defines an assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The jury here was instructed on the elements of section 245, subdivision (a)(2), in CALCRIM No. 875, in pertinent part as follows: "One, the defendant did an act with a

firearm that by its nature would directly and probably result in the application of force to a person; two, the defendant did that act willfully; three, when the defendant acted, he or she was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and four, when the defendant acted, he had the present ability to apply force with a firearm."

The trial court properly instructed the jury with CALCRIM No. 875 regarding the offense of assault with a firearm for both counts 3 and 4. The instruction accurately tracks the language of sections 240 and 245, subdivision (a)(2). The instruction also properly informed the jury that before finding defendant guilty of assault with a firearm, it must find that at the time defendant acted, "he had the present ability to apply force with a firearm." CALCRIM No. 875 also told the jury that the term "firearm" includes "any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion." This language is reasonably understood to mean that an assault with a firearm occurs when the firearm can be used to fire a projectile and that the firearm must contain a projectile to fire at the victim. It also properly is understood that the firearm itself can be used to apply force, loaded or unloaded. The jury was properly instructed on the elements of section 245, subdivision (a)(2).

Moreover, even if the trial court erred by omitting the special language proffered by defendant, the omission was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [standard of harmless beyond a reasonable doubt employed for federal constitutional error]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable

probability of a more favorable result is standard for assessing state law error].)  The jury was fully instructed concerning the elements of the charged offense.  As stated above, substantial evidence supported that Face brought a loaded weapon to the motel room. Additionally, there is no doubt defendant used a firearm as a club or bludgeon against A.Z.  The jury reasonably concluded that defendant was guilty in counts 3 and 4.

E.        FIREARM ALLEGATIONS

Defendant contends, and the People concede, that the allegations found true for counts 3 and 4 that a principal was armed with a firearm pursuant to section 12022, subdivision (a)(1) must be stricken.  In addition, the one-year enhancement imposed for count 1 for the section 122022, subdivision (a)(1) conviction must be stayed.  Finally, the personal-use firearm enhancement for count 4 must be stricken.

Defendant was convicted of violating section 12022.53, subdivision (b) on count 1 and sentenced to 10 years.  In addition, the court imposed one year for the principal armed enhancement pursuant to section 12022, subdivision (a)(1) on count 1.  The trial court could only impose the firearm enhancement with the longest term of imprisonment and must impose and stay the remaining sentences on additional firearm enhancements. (See *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129-1130; *People v. Sinclair* (2008) 166 Cal.App.4th 848, 854.)  We will direct the trial court to stay the section 12022, subdivision (a)(1) enhancement on count 1.

In addition, the enhancements on counts 3 and 4 under section 12022, subdivision (a)(1) must be stricken.  "Subdivision (a)(1) of section 12022 authorizes a one-year enhancement for the use of a firearm in the commission of a felony, 'unless the arming is

an element of that offense.'"  (*People v. Sinclair*, *supra*, 166 Cal.App.4th at p. 855.)

Section 245, subdivision (a)(2) necessarily requires arming with a firearm.  The

enhancements found true under section 12022, subdivision (a)(1) should be stricken.

(*Sinclair*, at p. 857.)  We will order that the sentence be modified to strike the

enhancements pursuant to section 12022, subdivision (a)(1) on counts 3 and 4.

Finally, defendant could not be convicted of the personal-use firearm allegation in

count 4 found true by the jury pursuant to section 12022.5, subdivision (a).  Section

12022.5, subdivision (a), imposes an additional term of imprisonment for "any person

who personally uses a firearm in the commission of a felony."  The evidence for count 4

was that Face held N.A. at gunpoint.  Since there was no evidence that defendant

personally used a firearm during the commission of the assault on N.A., we will order

that the trial court strike the enhancement.

E.      <u>654 STAY ON COUNT 2</u>

Defendant insists that the trial court should have stayed his sentence on count 2 for

being a felon in possession of a firearm because there was no evidence he possessed the

firearm before or after the robbery.  The trial court found at the time of sentencing, that

section 654 did not apply to "Count 2 because possession of the firearm by a prohibited

person does involve—I do find it's a separate and divisible intent."

"Section 654 precludes multiple punishments for a single act or indivisible course

of conduct."  (*People v. Hester* (2000) 22 Cal.4th 290, 294.)  "It is defendant's intent and

objective, not the temporal proximity of his offenses, which determine whether the

transaction is indivisible.  [Citations.]  We have traditionally observed that if all of the

offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.  [Citation.]  [¶]  If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'"  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

The trial court's findings will not be reversed on appeal if there is substantial evidence to support them.  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)

This case is similar to *People v. Jones* (2002) 103 Cal.App.4th 1139.  In that case, the defendant, a convicted felon, drove by the house of his ex-girlfriend and shot into the house several times.  When he was apprehended, no gun or ammunition was found in his possession.  He was convicted of being a felon in possession of a firearm and shooting at an inhabited dwelling.  He argued on appeal that his sentence of possession of a firearm by a felon should be stayed.  (*Id.* at pp. 1141-1142.)  The appellate court initially noted, "'"[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved.  On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense."'"  (*Id.* at pp. 1143-1144.)  It also noted, "[S]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm."  (*Id.* at p. 1145.)  As such the court

ruled, "The record supports the trial court's implied findings, because the evidence was sufficient to allow the inference that [the defendant's] possession of the firearm was antecedent to and separate from the primary offense of shooting at an inhabited dwelling. It strains reason to assume that [the defendant] did not have possession for some period of time before firing shots at the [victim's] home. Any other interpretation would be patently absurd." (*Id.* at p. 1147.)

Similarly here, it "strains reason" to conclude defendant did not possess the firearm for a period of time prior to the robbery. F.F. had seen defendant in possession of handguns a "few different times" prior to the date of the robbery. Further, it is not reasonable to conclude that Face gave defendant the weapon as they entered the motel room, as Face had a weapon of his own. It was reasonable to conclude that defendant brought the gun with him in the car to facilitate taking the heroin, or at least possessed the gun for a short period of time prior to the robbery. Section 654 did not apply to count 2.

Finally, the People have stated that the abstract of judgment should be corrected to show that the oral pronouncement of sentence for count 4 was that the sentence was stayed. At the time of sentencing, the trial court initially stated it was going to stay the sentence on count 4. However, the People argued that count 4 involved a different victim and that it should be imposed. The trial court then stated, "With regard to Count 4, I want to revisit that term. With regard to Count 4, it is a subordinate term. . . . I am imposing one-third of the midterm, which would be one year." Defendant agrees on appeal that such term was imposed. We decline to amend the abstract of judgment as stated by the People.

**DISPOSITION**

We direct the trial court to modify the minute order from sentencing and the abstract of judgment that the sentence enhancement pursuant to section 12022, subdivision (a)(1) for count 1 be stayed, that the same enhancement on counts 3 and 4 be stricken and that section 12022.5 enhancement on count 4 be stricken. The trial court is further directed to send an amended abstract of judgment to the California Department of Corrections and Rehabilitation. We otherwise affirm the judgment in its entirety.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

HOLLENHORST
Acting. P. J.

McKINSTER
J.